## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| 3D IMAGING AND SIMULATION CORP AMERICAS, and 3DISC HOLDING INC., <br><br> Plaintiffs, <br><br> v. <br><br> AURALITY, INC., MATHIEU AUBAILLY, and SIGRID SMITT GOLDMAN, <br><br> Defendants. | C.A. No. _____ <br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

1.     Plaintiffs 3D Imaging and Simulation Corp. Americas d/b/a 3DISC Imaging ("3DISC Americas") and 3DISC Holding Inc. ("3DISC Holding") (collectively, "3DISC" or "Plaintiffs") bring this action to redress the improper and unlawful conduct of Defendant Aurality, Inc. ("Aurality"), Defendant Mathieu Aubailly ("Aubailly"), and Defendant Sigrid Smitt Goldman ("Smitt Goldman") (collectively, "Defendants"), which has caused (and will cause) monetary and non-monetary harm to 3DISC.

2.     As explained below in greater detail, Defendants have misappropriated 3DISC's trade secrets and breached several contractual obligations owed to 3DISC (or intentionally interfered with contractual obligation owed to 3DISC); Defendants have been unjustly enriched; Aubailly has violated his fiduciary obligations to Plaintiffs; and Plaintiffs seek declaratory judgments that (a) they (and not Aubailly) should have right, title, and interest in all intellectual property and inventions that Aubailly clandestinely developed for Aurality and/or Smitt while working for 3DISC (in contravention of his contractual obligations to 3DISC), and (b) 3DISC does not owe any money under a promissory note (because of Defendants' improper conduct).

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, 2201, *et seq.*; Rule 57 of the Federal Rules of Civil Procedure; and Section 8.11 of the October 6, 2020 Stock Purchase Agreement (the "SPA") between Plaintiffs and Defendants and the October 6, 2020 Promissory Note ("the Note") (as both are described below).

4.    This Court has personal jurisdiction over Aurality, which is incorporated in the State of Delaware.

5.    This Court has personal jurisdiction over Smitt Goldman and Aubailly under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 10 Del. C. § 3104.

6.    Smitt Goldman incorporated Aurality in the State of Delaware with the intention of breaching her obligations to 3DISC and interfering with Aubailly's obligations to 3DISC (as both are described below; Aubailly was employed by 3DISC Americas (and later 3DISC), and 3DISC's claims concern (among other things) his breaches of his employment and other obligations to 3DISC (as described herein); Smitt Goldman and Aubailly have caused tortious harm to 3DISC in the State of Delaware through the actions described herein; Smitt Goldman and Aubailly were prior stockholders of 3DISC Americas (as described herein). Accordingly, Smitt Goldman and Aubailly have (at least) minimum contacts which subject them to the jurisdiction of the courts of the State of Delaware.

7.    Smitt and Aubailly, agreed, in Section 8.11 of the SPA, that they would "irrevocably submit" to the jurisdiction of this Court in any suit, action, or proceeding "arising out of or based upon" the SPA. As explained below, 3DISC's claims against Smitt Goldman and Aubailly "arise out of or are based upon" the SPA because they involve Intellectual Property (as described below) the Note, the relationship between 3DISC and Aubailly that would otherwise not

exist but for the SPA, and Aubailly's access to the Technology, the Hardware, the Software, and 3DISC's Confidential Information (as all are described below).

8.      Smitt Goldman also is the President, the sole officer, and the sole director of Aurality, which means this Court has personal jurisdiction over Smitt Goldman. *See* 10 Del. C. § 3114.

9.      3DISC has asserted a breach of fiduciary duty against Aubailly in his capacity as the former CTO of 3DISC (and otherwise), which is another basis for this Court's exercise of personal jurisdiction over him. *See id*.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c), and Section 8.11 of the SPA and the Note (both defined below).

## PARTIES

11.     3DISC Americas is a corporation incorporated under the laws of the State of Delaware, with a principal place of business located at 365 Herndon Parkway #18, Herndon, Virginia 20170.  Its parent corporation is 3DISC Holding.

12.     3DISC Holding is corporation incorporated under the laws of the State of Delaware, corporation on February 26, 2019, with a principal place of business located at 580 Herndon Pkwy #350, Herndon, Virginia 20170.  Its parent corporation is 3DISC Dental Connect SAS, which is a corporation organized under the laws of France, with its principal place of business in Courbevoie, France.

13.     According to the Delaware Secretary of State's website, Defendant Aurality is a corporation incorporated under the laws of the State of Delaware, with a principal place of business located at 580 Herndon Pkwy #350, Herndon, Virginia 20170, and its registered agent for service of process is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

14.     Upon information and belief, Aubailly is the Chief Executive Officer ("CEO") of Aurality, the former Chief Technology Officer ("CTO") of 3DISC, and an individual of the age of majority residing in Fairfax County, Virginia.  He is also a former shareholder in 3DISC Americas (until the October 2020 execution of the SPA, discussed below).

15.     Upon information and belief, Smitt Goldman is the President of Aurality and an individual of the age of majority residing in Fairfax County, Virginia.  She is the former CEO and was, directly or indirectly, a former shareholder 3DISC Americas (until the October 2020 execution of the SPA, discussed below).

## FACTUAL ALLEGATIONS

I.     **Intraoral Scanners and 3DISC's Technology**

    A.     **Intraoral Scanners**

16.     Generally speaking, an intraoral scanner (also referred to as an "iOS"), is a handheld device that generates digital images (or a three-dimensional ("3D") model) and is primarily used by dental professionals for scanning an oral cavity (a mouth).  Intraoral scanners are a non-invasive and safe alternative for creating "traditional" dental impressions (such as molds) that cause patient discomfort, can be messy, take time to create, can be difficult to do correctly, result in material waste (are less eco-friendly), are and often less accurate.

17.     There are two basic components to an intraoral scanner (scanning system):  (1) hardware that is held by the dental professional that contains a camera(s), optics(s), a light source, and other necessary circuitry and components necessary to capture and communicate images: and (2) software running on an adjacent computing device  (which is often connected, physically or otherwise, to the hardware) that processes and presents the images and information received from the hardware.

18.     Although the hardware of an intraoral scanner is public (it is visible to the user), the only part of the software portion of the intraoral scanner that is publicly disclosed is the software's user interface.

19.     The "secret sauce" of an intraoral scanner is in the non-public aspects of its software (both what is on the computer and the integration with the hardware).  Rendering 3D images of (for example) a plastic mold of teeth and gums can be straightforward, but doing so in real-time in a patient's mouth to just capture the teeth and gums is difficult to do correctly and accurately.  This is because of, among other reasons, soft tissue interference (cheeks and tongue), moisture, and difficulty getting to hard-to-reach areas as well as the technical complexities related to combining the image data into a coherent representation.  It is for these reasons, among others, that there are very few companies in the world (3DISC being one of them) that have been able to bring accurate and high-quality intraoral scanners to market—that stay on the market.

**B.     3DISC's Technology**

20.     Over at least the past decade, 3DISC has invested millions of dollars to develop the technology needed to create compact and accurate, fast 3D digital scans of areas of the human body that previously have proven difficult to access and accurately image (the "Technology").

21.     There are three principal components to the Technology:  the hardware required to physically conduct a scan, the software required to convert the data collected by the scan into a usable and reliably accurate form, and the integration of the hardware and the software together.

22.     The software portion of the Technology includes all source code, executable code, pseudo code, software development documents, application interfaces, firmware, software specifications and technical details, and all other electronic and physical information that 3DISC (or its predecessor entity) has used or uses to develop and deploy such software (including iterations that are not necessarily in the current implementation but have served as a stepping

stone), the operation of such software, and all details that allow the software portion of the technology to convert the data collected by a scan into a useable form (collectively, the "Software").

### 1.    Before October 2020

23.    As explained below in greater detail, 3DISC Americas was founded in 2010.  Upon information and belief Aubailly was 3DISC Americas' second hire and was the "second-in-command" at the company after Smitt Goldman.  Because Smitt Goldman does not (upon information and belief) have a technical background, Aubailly (who does) was in charge of all technical aspects the company.

24.    Upon information and belief, it took 3DISC Americas approximately five years to develop the hardware and software for its intraoral scanner, which it named Heron iOS.  In connection with the sale of 3DISC Americas (and thereafter), Aubailly was consistently referred to as the "father" of the Heron iOS.

25.    As explained in greater detail below, 3DISC Americas was sold in October 2020 to Plaintiffs in accordance with the SPA.  Smitt Goldman did not have any role or connection to the new entity (3DISC), but Aubailly was kept on as its CTO (until his resignation in August 2023).

26.    Marie-Laure Pochon was the principal driver, on behalf of the Buyer (as defined below), in wanting to acquire 3DISC America.  She had substantial prior experience in the dental-tech industry and was looking to invest in a company that had developed an intraoral scanner because she understood how hard it was (and is) to develop a good one (including for the above reasons).  She liked 3DISC's Heron iOS, particularly the hardware (which she found light, easy to use, and convenient), believed that the Heron iOS's software needed to be improved.  For example, although the software could create a 3D image of a teeth-and-gums model (or mold), it faced significant challenges in doing so in the "real world" environment of a patient's mouth.

6

2.    **After October 2020**

27.    Shortly after acquiring 3DISC, Pochon (and others) undertook a three-month evaluation the Heron iOS. 3DISC concluded that Heron iOS's difficulties in creating "real world" 3D models of a patient's teeth and gums meant that it —and partularly the software—needed substantially more work and development. During this time, Aubailly reported directly to Pochon (who was 3DISC's President and CEO), as he had done under Smitt Goldman.

28.    Pochon believed that 3DISC needed someone with technical experience in the "real world" of intraoral scanner and dental technology. She also discovered that Aubailly had expertise in developing optical hardware systems, understood the theory, but had limited expertise in developing the software for the "real world" intraoral scanners and dental industry experience (and limited software experience in general).

29.    3DISC hired Eamonn Boyle in 2021, who has both technical experience and the "real world" experience that she felt was necessary to improve the Heron iOS, partularly its software. Boyle's first role at 3DISC was as a Director of 3DISC's software (Aubailly was focused on hardware and manufacturing improvements). In April 2023, Boyle was elevated to become 3DISC's Executive Vice President of R&D, which meant that he was ultimately responsible for all research and development efforts at 3DISC. Boyle is still in this position today.

30.    Around that time, Pochon told Aubailly that he would remain as CTO (focused on hardware), but report to Boyle (rather than Pochon). Aubailly bristled at this change.

31.    Although Boyle was primarily responsible for 3DISC's Software and Aubailly was primarily responsible for 3DISC's hardware, both men (and all others on the R&D team) had complete access to all confidential, proprietary, and trade secrets aspects of both the Hardware and the Software.

32.     Under Boyle's leadership, 3DISC rewrote and reworked substantial portions of the Heron iOS software (although keeping some of the of the basic building blocks) and gave it a complete overhaul so that it worked much better in the "real world" environment of a patient's mouth.  Aubailly was aware of and participated in this effort, but he focused on the development of 3DISC's hardware (as is discussed below).

### 3.      3DISC's Use of the Technology

33.     To date, 3DISC's only commercial application of the Technology is for an apparatus capable of revolutionizing the dental space by creating an intraoral scanner (first Heron iOS and later other intraoral scanners).    But, as discussed below, 3DISC has explored commercializing other applications of the Technology, including for an inner ear scanner.

34.     The hardware component of 3DISC's current commercial application of the Technology includes an intraoral scanner that is moved by the user (*e.g.*, a dental professional) around the patient's oral cavity.  The hardware projects (illuminates with) different light sources on to the surfaces of the oral cavity and collects data using dedicated sensor(s).  Although the as-sold versions of such intraoral scanner hardware is public, 3DISC's information and knowledge used to develop, control, and manufacture such hardware, including, but not limited to, all optical systems, including lenses, projectors, electronics, controllers, communications modules, development documents, schematics, prototypes, associated know-how, and other materials, is not (collectively, the "Hardware").  The Hardware is not limited to the current form factor of 3DISC's products, it can be used in developing different hand-held 3D scanning products for various medical and non-medical applications.

35.     The Software includes, among other things, a proprietary code developed to receive the data gathered by the intraoral scanner via custom interfaces (firmware/drivers) and render

images and scan data in a user-friendly fashion based on that data (*i.e.*, a plurality of images of the intraoral cavity, dental plaster models, or dental impressions gathered by the intraoral scanner).

36.    Among other things the Technology, the Hardware and the Software contain 3DISC's confidential, proprietary, and trade secret information relating to:  electronics and software architecture details, the means and methods used to control multiple light sources, the means and methods to synchronize images to give a consistent video stream to enable fluid delivery of frames, and the means and methods to display a live 3D image seamlessly and to continually update the 3D image to give additional guidance to the user as the 3D image is captured.

37.    The Technology, including the Software, be can easily be adapted and/or used for other commercial applications, including for example an inner ear scanner (with appropriate hardware for such an application).  For example, although 3DISC's current products use the Technology for intraoral 3D scanning (for inside a patient's mouth), users of 3DISC's current products can (and do) also use them for extraoral (outside of a patient's mouth) to create 3D images.  Thus, using (or minimally adapting) the Technology (in the same or different hardware) to create 3D scans of different parts of a patient's body (such as the ear canal) are well-known use cases for 3DISC's current and future products.  With respect to the ear canal, for example, a limiting factor on using 3DISC's current products is the size of the tip (that goes inside the ear canal).

38.    The Hardware, the Software, and manufacturing know-how constitute and comprise, and have been at all relevant times, 3DISC's closely guarded trade secrets, and constitute 3DISC's confidential and proprietary information.

39.     At all relevant times, and continuing today, 3DISC has taken (and takes) measures to ensure that the Technology, including the Hardware and the Software, are maintained as confidential and secret.  This includes, but is not limited to, using password-protected computer systems, limiting access to 3DISC employees on a "need to know basis," managing access to software code, libraries, etc. through bitbucket, and storing documentation (including technical drawings, and other project data) on archiving systems with strict access control, and entering into employment agreements with its employees requiring them to protect the confidentiality of all 3DISC's confidential, proprietary, and trade secret information (the Aubailly Employment Agreement's confidentiality (provisions) are similar to what 3DISC has required, and today requires, of all its employees).  Additionally, the separation of the Hardware and the Software development (both geographically and in terms of personnel) meant that few people at 3DISC (outside of 3DISC's leadership team, which included Aubailly) had the ability to access and understand the full scope of the confidential information relevant to the Technology (Hardware and Software) and the full nature of 3DISC's R&D efforts with respect to its current products as well as development and consideration of future products and markets.

40.     3DISC sells multiple intraoral scanner products in the United States (and throughout the world), including HERON iOS, OVO, OVO3, 3DISC Clinic, and Scan&Tell (the "3DISC Products")—all of which incorporate the Technology (including the Hardware and the Software).  These products have also been rebranded and resold by other industry partners.  Both Aubailly and Kevin Theatin (another former 3DISC employee who left to work for Aurality, as is discussed below) were intimately involved in the development and installation and start-up of a second production line with Alliage in Brazil and thus had complete end-to-end knowledge of how to manufacture the 3DISC Products.

41.    Exemplar images of 3DISC's Products are:

 

42.    As referenced above, since the SPA was signed, 3DISC's focus until recently has been on building a more robust solution for its current products.  The hardware improvements to drive to a stable reliable device have consumed the majority of the resources in the hardware team including the choice of materials on the hand piece, the finish of the outer shells and the updates of the electronics.  This culminated in the release of the OVO.  In conjunction with the release of OVO, there were several major improvements to the scanning and review software to overcome inadequacies including: better calibration, improved algorithms for the feature matching, integration, and rejection of frames into the 3D data sets as well as optimizations that enable the use of enhanced algorithms to continually assess, and redress the data already acquired including the use of AI and machine learning algorithms.  Given his role as CTO of 3DISC, Aubailly was most involved in the hardware aspects of these R&D efforts, he was often consulted on various other aspects of such efforts and (because he was the "father" of the Heron iOS).  Consequently, Aubailly was aware of (and had access to) 3DISC's confidential, proprietary, and trade secret information concerning the Hardware and the Software (as well as integration between the two).

## II.    The October 2020 Acquisition

### A.    Smitt Goldman Pre-Acquisition

43.    3DISC Americas was incorporated under the laws of the State of Delaware on January 29, 2010 and, at that time, Thomas Smitt Goldman-Jeppsen was named as the sole Director, as well as the President, Secretary, and Treasurer.

44.    Upon information and belief, on June 25, 2012, Smitt Goldman was named the President/Secretary/Treasurer of 3DISC Americas, replacing Thomas Smitt Goldman-Jeppsen.

45.    According to her LinkedIn profile, Smitt Goldman describes herself as the individual who "[f]ounded and built 3D[] Imaging, a successful medical and dental imaging company" and specializes in "[n]egotiation and contracts, mergers and acquisition, strategic planning, product marketing."

46.    Smitt Goldman's LinkedIn profile does not disclose her activities since October 2020:



### B.    Aubailly Pre-Acquisition

47.    In April 2015, Smitt Goldman (in her capacity of the CEO of 3DISC Americas) executed an employment agreement with Aubailly (the "Aubailly Employment Agreement").

48. The Aubailly Employment Agreement provides, *inter alia*, as follows regarding the

proprietary information:

> **<u>Acknowledgement of Ownership</u>**. The Company[1] has developed or has been given access to highly-valued trade secrets and proprietary information, including but not limited to computer code, technology, proprietary systems, inventions, discoveries, improvements, formulae, product data and specifications, production data and processes, customer lists, information on customer product preferences, information on customer quantity and technical requirements, product pricing information, geographic and sales data, sales methodologies and strategies, marketing research and data, and other information related to the conduct of the business of the Company or its affiliates ("Proprietary Information"). **You agree that any such information or intellectual property conceived, developed, or made by you during the course of your employment with the Company, whether directly or indirectly related to the business of the Company or its affiliates, amounts to Proprietary Information and is the sole and exclusive property of the Company, no matter whether or not the same was conceived, developed, or made either during your regular working hours or on the Company's business premises**.

Aubailly Employment Agreement at 2, § 4(a) (emphasis added).

49. The Aubailly Employment Agreement further provides:

> **<u>Duty of Confidentiality</u>**. You agree not to remove from the Company's business premises or retain any Proprietary Information, except in the normal performance of your duties with the Company. **You agree to promptly inform the Company of all Proprietary Information conceived, developed, or made by you. You agree, whether during the term of your duties or at any time thereafter, you shall not disclose any Proprietary Information to anyone (other than what is necessary for you to perform your responsibilities to the Company), and that you will not use Proprietary Information for your own benefit or for the benefit of third parties**. Upon termination of your employment, you agree to return to the Company all Proprietary Information in your possession in whatever form it may exist. You also agree to provide a written statement to the Company, if requested, certifying that you have complied with these requirements.

*Id*. at 2, § 4(b) (emphasis added).

50. The Aubailly Employment Agreement also contains the following non-compete

and non-solicitation obligations:

---

[1] The "Company," as used in the Aubailly Employment Agreement, is a defined term for 3DISC Americas.

**Non-Competition**. You agree that, during the term of your employment and for a period of 12 months from the date of your employment termination, **you will not, whether on behalf of yourself or for others, directly or indirectly**, as an individual, partner, corporation, shareholder, director, officer, principal, agent, affiliate, consultant, advisor, or employee, **compete with the business of the Company** in any geographic territory with respect to which you have been involved for the Company. If the Company should decide to terminate your employment without cause, i.e. as the result of downsizing or the like, then this clause shall not be in effect. **This clause shall remain in effect if your employment is terminated for cause, or if you choose to terminate your employment with the Company**.

* * *

**Non-Solicitation**. You agree that, during the term of your employment and for a period of 12 months from the date of your employment termination, you will not, on behalf of yourself or for others, directly or indirectly solicit or contact, in any manner or form, any past, or present customers of the Company or its affiliates (or potential customers specifically targeted by the Company or its affiliates) with any product or offering that competes with the products or offerings of the Company or its affiliates. **You also agree that, for a period of 12 months from the date of your employment termination, you will not, on behalf of yourself or for others, directly or indirectly induce, entice, hire, or attempt to hire or employ any employee of the Company or any of its affiliates**.

*Id*. at 3, §§ 5-6 (emphases added).

51. The Aubailly Employment Agreement also requires "further assurances"—specifically, Aubailly must "execute all applications, assignments, affidavits, and other documents and take such other actions as the Company may require in order to evidence, prove, or secure the Company's or its affiliates' rights, full and exclusive title, and interest in Proprietary Information, whether during the term of your employment with the Company or thereafter upon reasonable request of the Company." (the "Further Assurances Clause"). *Id*. at 2-3, § 4(c).

52. Finally, Aubailly agreed that any violation of the foregoing provisions:

[W]ill cause the Company serious and irreparable injury, that it will be difficult to adequately measure the damages to the Company from any breach by you of this Agreement, rendering an award of monetary damages an inadequate remedy, and that, in the absence of injunctive relief, the injury to the Company from any such

breach would be irreparable. You therefore agree that, in the event of a breach or attempted breach by you of Sections 4, 5 or 6, the Company will be entitled to obtain temporary and permanent injunctive relief from any court of competent jurisdiction, enforcing the terms of this Agreement.

*Id*. at 3, § 7.

53.    Aubailly's first role with 3DISC Americas was as Lead Systems Engineer, 3D Intraoral Products.

54.    In 2017, Aubailly became 3DISC Americas' CTO.  In that capacity, and until at least October 2023, Aubailly had unfettered access to and intimate familiarity with all aspect of 3DISC's confidential, proprietary, and trade secret information, including, but not limited to, the Technology.

55.    By at least October 2020, Aubailly owned shares in 3DISC Americas.

**C.    The October 2020 Acquisition of 3DISC Americas**

56.    On October 6, 2020, the SPA was executed between 3DISC Americas (and its then stockholders) (the "Sellers") and 3DISC Dental Connect Americas, Inc. (the "Buyer") to purchase all issued and outstanding shares of stock in 3DISC Americas and its affiliates, which included but is not limited to 3DISC Holding (the "Acquired Companies").

57.    Among others, Aubailly and Smitt Goldman were listed as Sellers in the SPA.

58.    Ribbits Galore LLC was listed as the majority owner of stock of the Acquired Companies and, upon information and belief, Smitt Goldman was a majority owner of Ribbits Galore LLC.  Smitt Goldman signed the SPA on behalf of Ribbits Galore LLC as its CEO.

59.    An entity identified as Great Blue, LLC ("Great Blue") was named as the "Sellers' Representative" in the SPA.  Great Blue is a limited liability company formed under the laws of the State of Delaware corporation on September 29, 2020.  Smitt Goldman signed the SPA on behalf of Great Blue as its President.

15

60.    As explained above, Pochon (and the stockholders of the Buyer) felt that the real value of 3DISC Americas was its Technology (which are included in "Intellectual Property" in the SPA) and the promise that it had for numerous applications which include, but are not limited to, intraoral scanners.  That is why Pochon (and the other stockholders of the Buyer) paid millions of dollars for a company that only had one product (Heron iOS), limited sales, and was losing money. It is also why Pochon (and the other stockholders of the Buyer) agreed to assume the about $10.5 million of collective debts of the Acquired Companies.

61.    The SPA defines Intellectual Property as follows:

[A]ny and all of the following in any jurisdiction throughout the world: (a) trademarks, service marks, certification marks, logos, trade dress, trade names, and other source or business identifiers, whether registered or unregistered, including all applications and registrations for any of the foregoing and all renewals and extensions thereof, all common law rights in and the goodwill connected with the use of and symbolized by the foregoing (collectively, "Trademarks"); (b) works of authorship (**including Software**), copyrights, mask work rights, database rights and design rights, **whether registered or unregistered**, including all applications and registrations related to the foregoing, renewals and extensions thereof and all moral rights associated with any of the foregoing; (c) **trade secrets and other proprietary and confidential information, including know-how, inventions (whether or not patentable), invention disclosures, ideas, developments, improvements, designs, drawings, algorithms, source code, methods, processes, techniques, formulae, research and development, compilations, compositions, manufacturing and production processes, devices, technical data**, specifications, reports, analyses, data analytics, customer lists, supplier lists, pricing and cost information and business and marketing plans and proposals; (d) **patents, industrial designs, utility models and applications for any of the foregoing, including all provisionals, continuations, continuations-in-part, divisions, reissues, re-examinations and extensions thereof**; (e) internet domain name registrations and social media accounts, handles and user names; and (f) other intellectual property and related proprietary rights, interests and protections.

SPA at § I (Definitions) (emphases added).

62.    Through the SPA, the Sellers represented that the Acquired Companies owned all Intellectual Property "as the sole and exclusive owner" and no employee has any ownership

interest in any Intellectual Property developed while employed by the Acquired Companies.  *Id*. at § 4.11(a)-(b).

63.     The Sellers also agreed to confidentiality, non-competition, and non-solicitation obligations set forth in the SPA.  *Id*. at §§ 6.01, 6.02.

64.     As part of the SPA (and attached to it), 3DISC Americas and 3DISC Holding agreed to pay Great Blue $2.5 million in the form of an unsecured promissory note (the "Note").  The full amount of the Note has not been paid to date.

65.     The SPA also contains a section relating to governing law and submission to jurisdiction that states, in part:

(a)     All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provisions or rule (whether of the State of Delaware of any other jurisdictions).

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN NEW CASTLE COUNTY. EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING…THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND RREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

*Id*. at § 8.11 (capitalization in original).

66.     At or shortly after the execution of the SPA, the Buyer was merged into 3DISC Holding, which continued to operate 3DISC Americas (through 3DISC Holding).  As mentioned above, 3DISC Holding is a wholly owned subsidiary of 3DISC Dental Connect SAS.

67.     Upon the signing of the SPA, Aubailly became 3DISC's CTO, but the Aubailly Employment Agreement still governed in all material respects.

## III.    3DISC's Confidential Research and Development Into Commercial Applications of the Technology For the Ear Canal

68.     In or around November 2021, 3DISC began exploring the possibility using Technology (and, in particular, the Software) to develop a commercial product that could be used to create scans of the inner ear canal (the "3DISC Inner Ear Project").  It was Pochon's idea to explore this use case of the Technology, given her prior experience and work for a Danish company that made and sold hearing aids (among other things).

69.     As part of the 3DISC Inner Ear Project, 3DISC considered creating hardware that would fit inside the ear canal to scan the ear canal and use the Software to process the captured data to help determine the proper dimensions for a hearing aid embedded inside a patient's ear, as the field of view could be dynamically adapted for the scan.

70.     3DISC invested significant resources to assess the potential applications of the Technology for the 3DISC Inner Ear Project.  Aubailly (in his role as CTO) was one of the 3DISC R&D employees responsible for it—although his role specific work was primarily related to the Hardware.

71.     One outcome of this Project was the first scanning of an inner ear canal was achieved in January 2022.  According to contemporaneous documents, that initial scan of the ear "was successful," was "relatively fast," and resulted in good quality images.

72.     Work on the 3DISC Inner Ear Project continued after that initial prototype test.  Consistent with his focus on the hardware for the Project, in or around March 2022, Aubailly was involved (along with Boyle and others) with possibly re-designing the "tip" (the portion of the hardware to go inside a patient's ear) of the prototype to make it smaller (to fit inside patient's ear)

and to allow it to go as far as necessary inside the inner ear canal to be able to create a complete 3D image.

73.     In April 2022, 3DISC assessed that additional hardware changes were needed and put the 3DISC Inner Ear Project on hold.  It also decided to shift its technical resources back to its ongoing refinement of its intraoral scanning product.  At no point, however, did 3DISC conclude that it could not design and bring an inner ear canal scanner to market that used the Technology, and it remains a future possibility at 3DISC.  On the contrary, the main reason that (in April 2022) 3DISC decided not to continue with the 3DISC Inner Ear Project was because of limited financial resources and the small size of its technical team.  Therefore, when 3DISC believes it can devote sufficient resources to the 3DISC Inner Ear Project (once its revenue stream allows it to expand its technical team and product offerings) it intends to resume it.

74.     Despite this, all work associated with the 3DISC Inner Ear Project, constituted (and constitutes) 3DISC's confidential, proprietary, and trade secret information.  Further, the existence of that project constituted—at all relevant times—3DISC's confidential, proprietary, and trade secret information.  3DISC took the same steps to ensure the confidential nature of this project, and the information learned and created during this project, as described above in connection with the Hardware and the Software.

IV.     **Aurality is Formed**

75.     According to the Delaware Secretary of State's website, on February 20, 2023— less than a year after 3DISC put the 3DISC Inner Ear Project on hold—Aurality was incorporated.

76.     Upon information and belief, Smitt Goldman and/or Aubailly are directly or indirectly responsible for Aurality's formation.

77.     Aubailly resigned from his role as 3DISC's CTO on or around August 25, 2023.

78.     In connection with his resignation, Aubailly falsely (or at least misleadingly) informed 3DISC that he did not have another job and that he was interviewing for a new one.  In fact, as explained below, Aubailly was already working with Aurality and/or Smitt Goldman.

79.     At his request, Aubailly continued to consult for 3DISC until at least October 2023.

80.     While he was consulting, and at Aubailly's request, he retained access to his 3DISC email and Teams account—and was otherwise not restricted from accessing 3DISC's computer systems, which contained the Technology and 3DISC's other confidential, proprietary, and trade secret information.  This access included, but was not limited to, 3DISC's Hardware and Software.

81.     Upon Aubailly's stopping work as a consultant for 3DISC (in October 2024), 3DISC promptly restricted his access to 3DISC's internal computer systems.

82.     According to Aubailly's LinkedIn profile, he became the CEO of Aurality in 2024, although (as explained below in connection with the '762 Application) he began to work for Aurality and/or with Smitt Goldman in connection at least as early as August 14, 2023 (and, upon information and belief, well before then).

A.      **Additional 3DISC Employees at Aurality**

83.     In July 2023, Kevin Theatin ("Theatin") resigned from 3DISC (he initially resigned in February/March, 2023 timeframe (*i.e.,* around the time Aurality was incorporated), but Pochon convinced him to stay by, among other things, increasing his areas of responsibility (by removing some from Aubailly and reporting to Tina Russ)).  Until then, he was 3DISC Americas' lead system and algorithm engineer.  According to his LinkedIn profile, Theatin became Aurality's lead system engineer in July 2023.  Theatin had an employment agreement with 3DISC, which contained the same (or substantively the same) provisions as the aforementioned ones in the Aubailly Employment Agreement, including those related to confidentiality, proprietary information, non-competition, non-solicitation, and otherwise.  Theatin's employment agreement

was signed by Aubailly (in his capacity as CTO of 3DISC) on October 26, 2022 and countersigned by Theatin on October 27, 2022.

84.    Trina Russ was 3DISC's Computer Vision Research and Development Manager from June 2019 through September 2023. Russ's employment agreement was signed by Smitt Goldman (on behalf of 3DISC Americas), and contains the same or substantively the same provisions as the Aubailly Employment Agreement. In connection with her stopping work for 3DISC, Russ reaffirmed her obligation to not disclose any confidential business information, including trade secrets, intellectual property, proprietary information, and financial information— that she received in connection with her employment at 3DISC. Although there is no public disclosure of Russ' employment situation, upon information and belief, Russ is currently employed by or is a consultant/contractor to Aurality.

85.    In August 2023, Qingyun Wang "Kelly" Wang, who was 3DISC's Principal Electronics Engineer, resigned from 3DISC. Until her resignation, Wang was 3DISC's Senior Electronics Engineer (and had been for about eight years). During that time, she worked on the Heron iOS electronics design and transfer to production, and on R&D electronics in connection with 3DISC's next generation OVO product—although she was exposed to other areas, given the cross-disciplinary nature of 3DISC's R&D efforts. Her current employment status is unknown, but she worked on the R&D team since 2016 with Aubailly, Theatin, and Russ; she also worked with Smitt Goldman at 3DISC Americas.

86.    Although it took 3DISC substantial time and effort to develop the Technology and its complex proprietary software and systems for its current commercial products, Aubailly joined Aurality, and launched a near-identical imaging system (but directed to the ear canal) called the Aurality Empress3D Scanner (the "Empress3D") within months. Aurality's Empress3D is

approximately the same size and footprint as 3DISC's Heron iOS and OVO products.  With the additions of Theatin and Russ (at least), Aurality has now hired the core of the of 3DISC's technical team.

87.     Based on its LinkedIn page, Aurality has 2-10 employees, but Aubailly, Theatin, and Oliver Smitt Goldman-Jeppesen are the only ones who list Aurality on their LinkedIn pages (although she does not list it in her LinkedIn profile, Smitt Goldman is Aurality's President, sole officer, and sole director).  Additionally, due to the timing and nature of other employee resignations (such as Wang) and the lack of transparency as to their future plans, 3DISC has a reasonable belief that discovery will demonstrate that other former 3DISC employees have been, are, or will be employed directly or indirectly at Aurality.

## V.     Aurality's Empress3D Product

88.     According to Aurality's website, it is taking "pre-orders" for the Empress3D.  *See* https://www.aurality.com/OurProduct.

89.     Given that Aurality was only formed in February 2023 and Aubailly began working for it (as its CEO) in 2024, it appears that the end-to-end development of the Empress3D was completed in just months (Empress3D was publicly unveiled as a functioning device by, at least, April 2025, which means all development effort had to have been completed well before then).  In comparison, it took 3DISC Americas, when it was led by Smitt Goldman and Aubailly, approximately five years for its end-to-end development of the Heron iOS as it existed as of October 2020 (which, as discussed above, did not work well in the "real world" of the inside of a patient's mouth).

90.     Aurality was able to develop its Empress3D in such a short window of time because of the massive "head start" afforded it by stealing and misusing 3DISC Intellectual Property and confidential, proprietary information, including, but not limited to, the Technology, the Hardware,

the Software, and information related to the 3DISC Inner Ear Project —all of which is 3DISC's confidential, proprietary, and trade secret information (the "3DISC Confidential Information").

91.    When they were employed by or associated with 3DISC, Aurality's leadership and technical team had unfettered access to the 3DISC Confidential Information both before the SPA was signed (Smitt Goldman, Aubailly, and Russ were associated with 3DISC before the SPA was executed) and after the SPA was signed (Aubailly, Theatin, Russ, and, possibly, Wang).  Such access to 3DISC's Confidential Information was only given in connection with these individuals' work for and on behalf of 3DISC, and not for any other purpose.  At no time did 3DISC authorize Aubailly, Theatin, and Russ, (or any other 3DISC employee) to use or disclose any of the 3DISC Confidential Information, and doing so violates their respective employment agreements with 3DISC.  Additionally, Aubailly had an obligation, under the SPA, not to use or disclose any of the 3DISC Confidential Information outside of 3DISC (Smitt Goldman had the same obligation under the SPA, but she did not continue working for 3DISC after it was executed).

92.    Upon information and belief, Aurality, Smitt Goldman, and Aubailly used—and misappropriated—the 3DISC Confidential Information in connection with the design, development, and manufacture of Aurality's Empress3D product.

93.    Upon information and belief, Smitt Goldman (before Aurality) had no experience developing, designing, or selling products (3D or otherwise) for scanning a patient's ear canal— nor does she have a sufficient technical background to do so on her own.

94.    Upon information and belief, the sum total of Aubailly's, Theatin's, Russ's, and Wang's experience and knowledge in exploring, developing, and designing a scanning product (3D or otherwise) for a patient's inner ear was their exposure to and participation in the 3DISC

23

Inner Ear Project (discussed above). And, as explained above, that project concluded less than a year before Aurality was formed.

95. As explained above, although he was the CTO of 3DISC, Aubailly primarily worked on the Hardware for the 3DISC Products. Although he was involved in the initial development of Heron iOS (at 3DISC Americas), there were (after October 2020) substantial improvements and changes to the Software. Aubailly was aware of these improvements and changes, but his contributions to them were limited. Thus, that Aurality (under the leadership of Smitt Goldman and/or Aubailly) was able to develop software for its Empress3D (as well as its hardware) so quickly. Aurality was incorporated in February 2023 (by Smitt). Aubailly began formally working for it as its CEO in December 2024 (upon information and belief, and as explained below, Aubailly was working on the development of the Empress3D while he was employed by 3DISC in violation of the Aubailly Employment Agreement), and the Empress3D was announced for pre-sales in at least April 2025 (which meant development work was completed well before then). This months-long development timeframe is surprising, to say the least—particularly because it took Smitt Goldman and Aubailly approximately five years to develop Heron iOS (as it existed in October 2020).

96. Additionally, a review of public information about the Empress3D shows inexplicable similarities between the apparent operation of Empress3D's software and 3DISC's Software, including but not limited to:

    a. The layout of software, as seen by the user, of either the Empress3D or the 3DISC Products, is similar. This includes the "live scan preview," the "scan review and adjustment tools," and the exporting of the 3D images. The use of the guidance, association of the 2D and 3D

as well as the notion of quality of the scan or the distance of the device from the surface are all core elements developed to improve the user experience in 3DISC scanning solutions.



**Empress3D**                                        **3DISC**

The above image on the right, from 3DISC's Software, shows how far away the 3DISC hardware is from what it is scanning (using colors on the image itself). Similarly, the above image on the left, from Empress3D's shows how far away Empress3D's hardware is from what it is scanning (vertical bar using similar colors as 3DISC).

        b.     Based on Aurality's public YouTube videos, the Empress3D software appears to use the same process as does the 3DISC Products to transform and "continually inject" the series of two-dimensional images captured by the Empress3D hardware into a 3D image. That the Empress3D captures images of a patient's ear canal but the 3DISC Products capture images of the patient's teeth and gums is—at least for purpose of creating a 3D image in real-time. Below are exemplary images that show the operation of the Empress3D and 3DISC's Software:

 

**Empress 3D**                              **3DISC's Original Software**

Both software displays real-time video (captured by the hardware) on the left and a real-time 3D image (created by the software) on the right. Additionally, both software displays colored areas (blue in the case of Empress3D and green in the case of 3DISC's Software) that guide the user (holding the hardware) to ensure that the respective area to create a 3D image is complete. Further, based on watching the Empress3D YouTube videos, it appears that there are striking similarities between it and the 3DISC Products in how they both render 3D images and how the 3D scene updates as the images are added.



**3DISC's current software with lighter tones—that are also found in Empress3D's styles**

c.    The Empress3D YouTube videos also suggest, at least, that its software uses the same (or a similar) way to integrate data from the hardware into the 3D data set (single frame

integration and using this for user feedback by highlighting the last area scanned), as does the 3DISC Products.

        d.     The Empress3D, based on Aurality's YouTube videos, "injects" or displays data "in frame" (meaning that it shows it in real time) as the user moves the hardware.

        e.     The Empress3D appears to have a small display on the hardware. 3DISC, during the time Aubailly was employed there, confidentially explored the possibility of doing something similar on the 3DISC Products.

97.    Based on the Empress3D YouTube videos and information on Aurality's public website, 3DISC believes, in good faith, that Empress3D, and its software, contains, leverages, or is improperly based on 3DISC's Confidential Information. 3DISC's investigation, however, is limited by the sparse (perhaps intentionally so) amount of public information about the operation of the Empress3D, and because much of the details of how the Empress3D software operates is non-public.

98.    Given the abbreviated development timeline for the Empress3D, Aubailly's limited experience with developing and refining 3D scanning software, Aubailly's (and other's) unfettered access to 3DISC's Confidential Information, including related to the Hardware, the Software, and the 3DISC Inner Ear Project, Aubailly's apparent work for Aurality while he was employed by 3DISC (see below discussion regarding Aurality's pending patent applications), and as further described herein, there is more than sufficient evidence to, at least, suggest that Defendants improperly used the Technology and/or 3DISC's Confidential Information. Regardless, 3DISC believes that discovery will reveal additional improper uses of the Technology and/or 3DISC's Confidential Information by Aurality and, in at least, Smitt Goldman, Aubailly, Theatin, and Russ (and, potentially, Wang and others).

99.    Defendants do not have (and never had) 3DISC's authorization to take or use the Technology and/or the 3DISC Confidential Information.

## VI.    Aurality's Pending Patent Applications

100.    According to the USPTO's public website, on September 27, 2023 Smitt Goldman filed a non-provisional patent application with the USPTO, which was assigned Application No. 18/475,762 (the "'762 Application"). The '762 Application is titled a "Method and Apparatus for Three-Dimensional Measurement of the Outer Ear Shape."

101.    A portion of the '762 Application for Smitt Goldman to complete contains a statement that "all inventors must be listed." Smitt Goldman completed that portion of the '762 Application by only listing herself as the inventor.

102.    According to the USPTO's public website, in connection with the prosecution of the '762 Application, Smitt Goldman, on August 11, 2023, filed a declaration with the USPTO in which she swore, under oath, that she believes that she is an "original inventor or an original joint inventor" of the claimed invention of the '762 Application (the "Smitt Goldman '762 Decl.").

103.    According to the USPTO's public website, about six months later, on March 7, 2024, a second declaration was filed with the USPTO in connection with the prosecution of the '762 Application. That declaration was signed by Aubailly.

104.    In that declaration, Aubailly swore, under oath, that as of August 14, 2023 he believed that he is an "original inventor or an original joint inventor" of the claimed invention of the '762 Application (the "Aubailly '762 Decl.").

105.    As of the date listed on the face of the Aubailly '762 Decl. (August 14, 2024), Aubailly was employed by 3DISC as its CTO.

106.    No reason was provided to the USPTO why the Aubailly '762 Decl. was not filed at the same time as the '762 Application or the Smitt Goldman '762 Decl., nor was the USPTO

given any reason why the Aubailly '762 Decl. was filed six months after the date listed on its face—or at any time before March 7, 2025.  Nor, according to the USPTO's public website, has there been any substantive changes to any aspect of the '762 Application since the date it was filed (September 23, 2023).

107.    Upon information and belief, Aurality, Smitt Goldman, and/or Aubailly intentionally did not file the Aubailly '762 Decl. until March 7, 2025 (even though it was dated August 14, 2024) in an effort to hide Aubailly's work on behalf of Aurality and/or Smitt Goldman in connection with the '762 Application and the Empress3D—including during the time that Aubailly was CTO and a consultant for 3DISC.  If 3DISC had known that Aubailly was working with Aurality and/or Smitt Goldman when he resigned from 3DISC (on August 25, 2024), it never would have agreed to allow him to work as a consultant, nor would it have given him continued and unfettered access to the Technology the 3DISC Confidential Information.

108.    According to the USPTO's public website, the same day the Aubailly '762 Decl. was filed (March 7, 2025), a Request for Correction of Inventorship for the '762 Application was filed to add Aubailly as inventor in accordance with the Aubailly '762 Decl.  The USPTO accepted this Request for Correction of Inventorship on March 12, 2025.

109.    According to the USPTO's public website, the '762 Application was published by the USPTO on March 27, 2025, and was assigned Pub. No. US 2025/0098982.  The two named inventors listed on the face published '762 Application are Smitt Goldman and Aubailly.  Based on the USPTO's public website, it does not appear that the USPTO has yet taken any outward steps in connection with the prosecution of the '762 Application.

110.    Before the '762 Application was published, on March 27, 2024, the prosecution history of that Application (including the content of the Application, Smitt Goldman's '762 Decl.,

the Aubailly '762 Decl., and the Request for Correction of Inventorship) was not publicly available, and 3DISC had no inkling of its existence.

111.    According to the USPTO's public website, on May 7, 2024, Aurality filed a Patent Cooperation Treaty ("PCT") patent application, which names Smitt Goldman and Aubailly as the two named inventors of the claimed subject matter, claims priority to the '762 Application, relies on (among other things) the Aubailly '762 Decl. as proof of Aubailly's inventorship contributions, and is otherwise substantively identical to the '762 Application.  That PCT application was assigned PCT No. IB2024/054435 (the "'435 PCT Application").  The '435 PCT Application was published by the World Intellectual Property Organization ("WIPO") on April 12, 2024 as WO 2025/068774 A1.

112.    According to Article 22 of the PCT, Aurality has 30 months from the filing of the '762 Application (*i.e.*, March 27, 2026) to nationalize '435 PCT Application in any of the over 190 jurisdictions (countries or regions) that are members of WIPO.  Upon doing so, the patent office(s) of such jurisdiction(s) will review the content of the '435 PCT Application and engage in patent prosecution to determine whether (or not) the '435 PCT Application will result in an issued patent in that jurisdiction.  If any such patent(s) issue, Smitt Goldman and Aubailly will be the named inventors.

113.    Based on the information on the USPTO and WIPO's public website, Aurality, Smitt Goldman and/or Aubailly will own right, title, and interest in patent that issues from the '762 Application or the '435 PCT Application (or claims priority to such Applications).

## CLAIMS FOR RELIEF

### COUNT I
### (Misappropriation of Trade Secrets Under The Defend
### Trade Secrets Act, 18 U.S.C. § 1836 – All Defendants)

114.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

115.    3DISC is the sole lawful owner of its trade secrets regarding the Technology, including the Hardware, the Software and the 3DISC Confidential Information.  *See* 18 U.S.C. § 1839(3).

116.    3DISC's trade secrets, including the Technology, the Hardware, the Software and the 3DISC Confidential Information derive significant economic value from not being generally known, and are not readily ascertainable by proper means.

117.    At all times, 3DISC's trade secrets, including the Technology, the Hardware, the Software and the 3DISC Confidential Information, have been subject to reasonable efforts to maintain their secrecy, including as described above.

118.    Defendants misappropriated 3DISC's trade secrets through improper means, including, but not limited to, by seeking and obtaining such information from (at least) Aubailly in violation of the Aubailly Employment Agreement (which Smitt Goldman and Aurality knew about) and in violation of the SPA.  *See* 18 U.S.C. § 1839(5)-(6).

119.    3DISC has suffered and continues to suffer significant, identifiable financial harm as a result of Defendants' misappropriation of trade secrets in violation of 18 U.S.C. § 1836.

## COUNT II
### (Misappropriation of Trade Secrets Under The Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, *et seq.* or Va. Code Ann. §§ 59.1-336, *et seq.* – All Defendants)

120.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

121.    Both the State of Delaware and the Commonwealth of Virginia have adopted and codified their own versions of the Uniform Trade Secrets Act (6 Del. C. § 2001, *et seq.* and Va. Code Ann. §§ 59.1-336, *et seq.*), but both statutes are substantively identical as the Uniform Trade Secrets Act for purposes of 3DISC's allegations in this Complaint.  Thus, this claim is based on versions of each state's trade secret statutes – as applies to 3DISC's allegations in this matter.

122.    3DISC is the sole lawful owner of its trade secrets regarding the Technology, such as the Software, the Hardware and 3DISC's Confidential Information

123.    Defendants knowingly misappropriated 3DISC's trade secrets through improper means, including, but not limited to, by seeking such information from (at least) Aubailly in violation of the Aubailly Employment Agreement (which Smitt Goldman and Aurality knew about) and in violation of the SPA, as well as in violation of the Theatin's employment agreement with 3DISC.

124.    3Disc has suffered and continues to suffer significant, identifiable financial harm as a result of Defendants' misappropriation of trade secrets in violation of Delaware and/or Virginia law.

## COUNT III
### (Common Law Misappropriation of Trade Secrets – All Defendants)

125.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

126.   3DISC is the sole lawful owner of its trade secrets regarding the Technology, such as the Software, the Hardware and 3DISC's Confidential Information

127.   3DISC is the sole lawful owner of its trade secrets regarding the Technology, such as the Software, the Hardware and 3DISC's Confidential Information

128.   Defendants knowingly misappropriated 3DISC's trade secrets through improper means, including, but not limited to, by seeking such information from (at least) Aubailly in violation of the Aubailly Employment Agreement (which Smitt Goldman and Aurality knew about) and in violation of the SPA, as well as in violation of the Theatin's employment agreement with 3DISC.

129.   3DISC has suffered and continues to suffer significant, identifiable financial harm as a result of Defendants' misappropriation of trade secrets.

**COUNT IV**
**(Declaratory Judgment as to the '762 and '435 PCT Applications – All Defendants)**

130.   3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

131.   On May 15, 2025, 3DISC sent Smitt Goldman, Aubailly, and Aurality, as well as Aurality's counsel, a series of letters in which 3DISC, among other things, asserted that they had recently discovered Defendants' theft and misuse of intellectual property and violations of employment contracts (including the Aubailly Employment Agreement), and stated that Defendants' actions made them liable for (among other things) breach of contract and tort claims against them.

132.   On May 21, 2025, counsel for Defendants responded to 3DISC's letters, denying all of 3DISC's allegations.

133.    The parties therefore disagree whether, among other things, 3DISC should be assigned (or should have been assigned), at least, Aubailly's right, title, and interest in the '762 Application and the '435 PCT Application (and all other applications and patents that claim priority to it).

134.    3DISC seeks a declaration that Aubailly's right, title, and interest in the '762 Application and the '435 PCT Application (and all other applications and patents that claim priority to it) should be assigned or otherwise transferred to 3DISC.

**COUNT V**
**(Breach of Fiduciary Duty – Aubailly Only)**

135.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

136.    As CTO of 3DISC, Aubailly was required to perform his duties and exercise his broad authority over 3DISC's R&D efforts, its Intellectual Property, and its Confidential Information in good-faith pursuit of 3DISC's best interests.

137.    Aubailly's relationship with 3DISC was that of a fiduciary.

138.    Aubailly engaged in a pattern of actions that violated the fiduciary duties he owed and continues to owe 3DISC under applicable law.

139.    By misappropriating 3DISC's Intellectual Property and Confidential Information, Aubailly breached the fiduciary duties he owed and continues to owe to 3DISC as its former CTO.

140.    3DISC has suffered significant, identifiable financial harm as a result of Aubailly's breaches of his fiduciary duties as CTO of 3DISC.

## COUNT VI
### (Breach of Contract – Aubailly Only)

141.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

142.    The Aubailly Employment Agreement is a valid and binding contract between Aubailly and 3DISC (through 3DISC Americas).

143.    3DISC performed all required obligations under the Aubailly Employment Agreement between the start of Aubailly's employment with 3DISC Americas until (at least) his voluntary resignation from 3DISC or about August 25, 2023.

144.    As is explained in greater detail above, the Aubailly Employment Agreement contains an acknowledgment (from Aubailly) that any intellectual property conceived, developed, or made during Aubailly's employment with 3DISC Americas—regardless of whether during working or non-working hours—is the "sole and exclusive" property of 3DISC Americas, regardless of whether it was indirectly or directly related to 3DISC Americas' business. Once the SPA was signed (in October 2024) the Aubailly Employment Agreement continued in full force and effect as between Aubailly and 3DISC.

145.    On August 14, 2024—which was over a week before Aubailly voluntarily resigned from 3DISC—Aubailly signed the Aubailly '762 Decl., in which he claimed that he was an inventor or joint inventor of one or more inventions of the '762 Application.

146.    Although, on August 14, 2024 (and before), Aubailly was employed by 3DISC, under the Aubailly Employment Agreement, he the never told 3DISC (either at the time or since) about his inventorship contributions to the '762 Application (or the existence of the '762 Application). Additionally, and upon information and belief, Aubailly was working with Aurality

and/or Smitt Goldman in connection with the '762 Application (and the inventions disclosed therein) well before August 14, 2023 when he signed the '762 Aubailly Decl.

147.    The Aubailly '762 Decl. and the Request for Correction of Inventorship in the '762 Application prosecution was filed in the USPTO, on March 7, 2024 and March 12, 2024, respectively. However, the USPTO did not make either document publicly available until at least March 27, 2024, when it published the '762 Application. Accordingly, 3DISC did not know— and could not know—of the existence and contents of the '762 Application, the Smitt Goldman '762 Decl., the Aubailly '762 Decl., and the Request for Correction of Inventorship until, at least, March 27, 2024.

148.    Upon information and belief, Aubailly has assigned his right, title, and interest in the '762 Application to Aurality.

149.    As stated on the face of the '435 PCT Application, Aurality filed such Application, listed Aubailly (among others) as a named inventor, and relied on the '762 Aubailly Decl. Consequently, 3DISC as a good-faith belief that Aubailly has assigned his right, title, and interest in the '435 PCT Application to Aurality.

150.    Aubailly's failure to assign his rights, title, and interest in the '762 Application and the '435 PCT Application (and any issued patents that claim priority to such Applications) is a breach of the Aubailly Employment Agreement and Aubailly has no lawful or valid excuse for not doing so.

151.    This failure by Aubailly to assign his rights, title, and interest in the '762 Application and the '435 PCT Application (and any issued patents that claim priority to such Applications) are breaches of at least the Acknowledgment of Ownership Clause, the Duty of

36

Confidentiality Clause, and/or Further Assurances Clause of the Aubailly Employment Agreement.

152.    3DISC has been irreparably harmed by Aubailly's breach of the Aubailly Employment Agreement.  Among other reasons, the Aubailly Employment Agreement states that a breach of the provisions relating to ownership of intellectual property "will cause [3DISC Americas] serious and irreparable injury, that it will be difficult to adequately measure the damages to [3DISC] from any breach by you of this Agreement, rendering an award of monetary damages an inadequate remedy, and that, in the absence of injunctive relief, the injury to [3DISC] from any such breach would be irreparable."

153.    3DISC has also been harmed because, among other things, it has lost the ability to make, use, sell or otherwise take advantage of the inventions described and claimed in the '762 Application or the '435 PCT Application—or any issued patents that claim priority to them.

154.    The Aubailly Employment Agreement also contained a Non-Competition Clause, which was in effect from (at least) the date Aubailly gave his resignation notice to 3DISC on August 25, 2023 for a period of 12 months, until (at least) August 25, 2024.

155.    As explained above, 3DISC embarked on the 3DISC Inner Ear Project in 2021-2022.  As explained above, although 3DISC had decided—for the time being—not to pursue an inner ear canal scanner, it has not abandoned that Project.  Therefore, 3DISC considers a 3D scanner for the inner ear canal part of "the business" of 3DISC, particularly given the background and expertise that 3DISC's current CEO has in this area.

156.    Aubailly's work with Smitt Goldman and Aurality, and his acceptance of the position of CEO of Aurality (and continued work in that capacity) is a breach of the Non-Competition Clause of the Aubailly Employment Agreement.

157.    The Aubailly Employment Agreement also contained a Non-Solicitation Clause. Given the timing of, at least, Theatin's departure from 3DISC and subsequent employment at Aurality—and Aubailly's secret work with and for Aurality and/or Smitt Goldman—upon information and belief, Aubailly violated the Non-Solicitation Clause of the Aubailly Employment Agreement.

158.    Aubailly, in the Aubailly Employment Agreement, agreed that breach of the Non-Competition Clause will cause 3DISC "serious and irreparable injury that it will be difficult to adequately measure" with monetary damages.

## COUNT VII
### (Intentional Interference With Contractual Relations – Aurality and Smitt Goldman Only)

159.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

160.    The Aubailly Employment Agreement is a valid, enforceable contract.

161.    Smitt Goldman was aware of the terms of the Aubailly Employment Agreement because, among other reasons, she signed it on behalf of 3DISC Americas.  Because Smitt Goldman was, at all relevant times, President of Aurality, her knowledge of the Aubailly Employment Agreement is imputed to Aurality.

162.    Consequently, Smitt Goldman and Aurality was aware that any intellectual Aubailly property conceived, developed, or made during Aubailly's employment with 3DISC—regardless of whether during working or non-working hours—is the "sole and exclusive" property of 3DISC, regardless of whether it was indirectly or directly related to 3DISC's business.

163.    As set forth herein, Aubailly breached his obligations under the Aubailly Employment Agreement.

164.    Smitt Goldman and Aurality were aware that Aubailly was employed by 3DISC until (at least) the time of Aubailly's voluntary resignation on August 25, 2023.

165.    Smitt Goldman and/or Aurality caused the '762 Aubailly Decl. and the Request for Correction of Inventorship to be filed in connection with the '762 Application.  As explained herein, the filing of the '762 Aubailly Decl. the Request for Correction of Inventorship lead Aurality to claim ownership of, at least, the '435 PCT Application and, upon information and belief, the '762 Application.  Further, upon information and belief, Smitt Goldman and/or Aurality caused Aubailly to assign his rights, title, and interest to the '762 Application and the '435 PCT Application—and any patents that claim priority to either one—to Aurality in knowing violation of the Aubailly Employment Agreement.

166.    Smitt Goldman and/or Aurality's actions constitute intentional and unjustified interference in the rights and obligations between 3DISC and Aubailly in the Aubailly Employment Agreement.  Such actions were also a significant factor in Aubailly's breach of his obligations under the Aubailly Employment Agreement, including because Smitt Goldman and/or Aurality caused the '762 Aubailly Decl. and the Request for Correction of Inventorship to be filed in connection with the '762 Application.

167.    3DISC has been irreparably harmed by Smitt Goldman and/or Aurality's intentional and unjustified interference with the Aubailly Employment Agreement.  Among other reasons, the Aubailly Employment Agreement states that a breach of the aforementioned provisions relating to ownership of intellectual property "will cause [3DISC] serious and irreparable injury, that it will be difficult to adequately measure the damages to [3DISC] from any breach by you of this Agreement, rendering an award of monetary damages an inadequate remedy,

and that, in the absence of injunctive relief, the injury to [3DISC] from any such breach would be irreparable."

168.    3DISC has also been harmed because, among other things, it has lost the ability to make, use, sell or otherwise take advantage of the inventions described and claimed in the '762 Application or the '435 PCT Application—or any issued patents that claim priority to them.

## COUNT VIII
### (Internal Interference with Contractual Relations – All Defendants)

169.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

170.    Throughout his entire employment with 3DISC, Theatin (at least) had employment agreements with 3DISC.  That employment agreement contained the same (or substantively the same) provisions relating to confidentiality, proprietary information, non-competition, and non-solicitation.

171.    Theatin's employment agreement is a valid, binding contract between 3DISC and Theatin.

172.    At all times during Theatin's employment with 3DISC, 3DISC performed all required obligations under Theatin's employment agreement.

173.    Because he signed Theatin's employment agreements (as 3DISC's CTO), Aubailly knew that such agreement contained, among other things, the same (or substantively the same) provisions relating to confidentiality, proprietary information, non-competition, and non-solicitation.  As CEO of Aurality, that knowledge of the contractual provisions is, at least, imputed to Aurality.  Upon information and belief, Smitt Goldman was also aware of those contractual provisions.

174.    Theatin works (or worked) on R&D for Aurality and in connection with the Empress3D, including when Aubailly was secretly working with Aurality and/or Smitt and also when Aubailly became CEO of Aurality.

175.    Upon information and belief, Defendants interfered with the contractual obligations between 3DISC and Theatin (at least) by, among other ways, seeking (and receiving) 3DISC's Confidential Information and the Technology, at least as it relates to their work at 3DISC.  Upon information and belief, Defendants' actions were a significant factor in Theatin's breach(es) of his obligations under his employment agreement with 3DISC.

176.    3DISC has been irreparably harmed by Defendants' intentional and unjustified interference with (at least) Theatin's employment agreement.  Among other reasons, Theatin's employment agreement states that a breach of the aforementioned provisions relating to ownership of intellectual property "will cause [3DISC] serious and irreparable injury, that it will be difficult to adequately measure the damages to [3DISC] from any breach by you of this Agreement, rendering an award of monetary damages an inadequate remedy, and that, in the absence of injunctive relief, the injury to [3DISC] from any such breach would be irreparable."

## COUNT IX
### (Unjust Enrichment – Aurality and Aubailly Only)

177.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

178.    Under the Aubailly Employment Agreement, Aubailly should have assigned his right, title, and interest in the '762 Application and the '435 PCT Application to 3DISC.

179.    Yet because, upon information and belief, the '762 Application has been assigned to Aurality (with Aubailly as a named inventors) and Aurality has filed the '435 PCT Application (again with Aubailly as a named inventor), Aurality and/or Aubailly will have right, title in interest

in any patents that issue from (or claim priority to) such Applications (and already have right, title, and interest in such Applications).

180.    Because patent rights (and even patent applications) are valuable property rights, Aurality and/or Aubailly has been enriched at the expense of 3DISC by their filing of the '762 Application and the '435 PCT Application and not assigning Aubailly's rights to 3DISC.

181.    This enrichment of Aurality and/or Aubailly was (and will be) unjust because it was the result of their improper, unlawful, and inequitable conduct.

182.    Permitting Aurality and/or Aubailly to retain the benefits the '762 Application and/or '435 PCT Application (with Aubailly as a named inventor), and patents that issue from (or claim priority to) such Applications, would not be in the interest of justice.

183.    3DISC is entitled to equitable restitution of the benefits that Defendants unjustly received, including, but not limited to, assignment of Aubailly's right, title, and interest in the '762 Application and/or '435 PCT Application (booth with Aubailly as a named inventor), and patents that issue from (or claim priority to) such Applications.

## COUNT X
**(Declaratory Judgment as to the Promissory Note – Aubailly and Smitt Goldman Only)**

184.    3DISC hereby realleges the foregoing paragraphs as though fully set forth in this claim for relief.

185.    The SPA is a valid and enforceable contract.

186.    Aubailly and Smitt Goldman violated the SPA by misappropriating Intellectual Property that they agreed to transfer to 3DISC through the SPA.

187.    Because Aubailly and Smitt Goldman breached the SPA, they are not entitled to enforce any obligation owed by 3DISC in connection with the SPA.

188.    3DISC is therefore entitled to a declaration that it is not obligated to remit the funds allegedly owed pursuant to the Note.

## DEMAND FOR RELIEF

**WHEREFORE**, 3DISC respectfully requests that the Court:

A.    Enter full and final judgment for 3DISC Holding and 3DISC Americas on all Counts in this complaint as follows;

    i.    That Defendants misappropriated 3DISC's trade secrets in violation of the federal Defend Trade Secrets Act (18 U.S.C. § 1836);

    ii.    That Defendants misappropriated 3DISC's trade secrets in violation of the Delaware Uniform Trade Secrets Act (6 Del. § 2001, *et seq.*);

    iii.    That Aubailly breached the fiduciary duties he owed and continues to owe to 3DISC;

    iv.    That Aubailly materially breached the terms of his employment agreement with 3DISC;

    v.    That Aurality and Smitt Goldman intentionally interfered with 3DISC's employment agreement with Aubailly;

    vi.    That Defendants intentionally interfered with (at least) 3DISC's employment agreement with Theatin;

    vii.    That Defendants were unjustly enriched at 3DISC's expense;

    viii.    Declare that Aubailly's right, title, and interest in the '762 Application and the '435 PCT Application (and all other applications and patents that claim priority to such Applications) should be assigned or otherwise transferred to 3DISC, and order Defendants to execute all documentation with the USPTO, WIPO, and any other "national" patent office to effectuate the Court's ruling; and

ix.    Declare that 3DISC has no obligation to make any payment under the October 6, 2020 Promissory Note identified in the October 6, 2020 Stock Purchase Agreement.

B.    Order Defendants to return to 3DISC any and all confidential information or trade secrets of 3DISC that Defendants (or any agent, employee, affiliate, etc.) have in their possession;

C.    Enjoin Defendants from further use of 3DISC's confidential information or trade secrets;

D.    Order Defendants to take all actions to assign or otherwise transfer Aubailly's right, title, and interest in the '762 Application and the '435 PCT Application (and all other applications and patents that claim priority to such Applications to 3DISC;

E.    Award Plaintiffs all compensatory, consequential, and punitive damages to which they are entitled, including the disgorgement of any profits Defendants received from their ill-gotten gains;

F.    Award Plaintiffs their attorneys' fees in bringing this action;

G.    Award Plaintiffs their costs in bringing this action;

H.    Award Plaintiffs interest; and

I.    Award Plaintiffs all other relief that the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, 3DISC demands a trial by jury on all issues so triable.

OF COUNSEL:

Benjamin M. Stern
Alex Rothschild
NUTTER MCCLENNEN & FISH, LLP
155 Seaport Blvd.
Boston, MA 02210
Telephone:  (617) 439-2000
Email:  bstern@nutter.com
　　　　 arothschild@nutter.com

Dated: June 6, 2025

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Plaintiffs 3D Imaging and*
*Simulation Corp. Americas and 3DISC*
*Holding Inc.*